**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>       Plaintiff,<br><br>v.<br><br>20,855.90 Acres of Land, et al.,<br><br>       Defendants. | No. CV-24-08240-PCT-KML<br><br>**ORDER** |

The State of Arizona ("Arizona") requests the court establish instructions for appraising about 20,856 acres of land which were condemned in January 2025 pursuant to a 1995 settlement between the United States and the Hopi Tribe. (Doc. 26.) The condemned land lies in a checkerboard pattern, interspersed with parcels of land which were formerly privately-owned and are now in trust on the Hopi Tribe's behalf. (Doc. 26 at 2.) Arizona argues the appraisal of the condemned land should not take into account the fact that the land is surrounded by land held in trust for the Hopi Tribe. (Doc. 26.) Its motion is denied as premature.

## I.    Facts

After a long history of land disputes and litigation between the United States, the Hopi Tribe, and the Navajo Tribe, in 1995 the United States and Hopi Tribe entered a settlement agreement under which the United States paid the Hopi Tribe money which the tribe could use to purchase land in northern Arizona. (Doc. 28 at 3, 5.) That settlement was ratified by Congress in 1996 (Doc. 28 at 5). Navajo-Hopi Land Dispute Settlement Act of

1996, Pub. L. No. 104-301, 110 Stat. 3649 (1996); *see* S. Rep. No. 104-363 (detailing text of settlement agreement). A remnant of the federal government conveying alternating parcels of land to railroad companies in the 19th century, land ownership in that area forms a checkerboard pattern with interspersed private and public land, with each box one square mile in size. (Doc. 28 at 5.) The public parcels were once federally-owned but were transferred to Arizona under the 1910 Arizona-New Mexico Enabling Act, to be held in trust by Arizona for public education purposes. (Doc. 27 at 11.)

Under the 1995 settlement, the Hopi Tribe could purchase private parcels and then request (and fund) the United States's condemnation of interspersed Arizona-owned parcels, with the United States placing all these lands into trust for the benefit of the tribe. (Docs. 26 at 8; 27 at 7.) But a condemnation could only occur pursuant to three conditions: the acquisition had to be consistent with the purpose of the Hopi Tribe obtaining no more than 500,000 acres of land; Arizona had to concur the acquisition would be consistent with its own interests; and the Hopi Tribe had to pay for the land. (Doc. 1 at 6.)

In 1997 and 1998, pursuant to that settlement, the Hopi Tribe purchased private parcels of land (and associated rights) which the United States took into trust on the tribe's behalf in 2008. (Docs. 26 at 9; 27 at 8.) Arizona alleges these purchases reduced the value of the adjacent Arizona-owned parcels because tribe-owned land cannot be accessed without that tribe's consent. (Doc. 26 at 4, 9.) For neighbors of tribe-owned land, this presents barriers to public rights-of-way and legal access which do not exist for neighbors of privately-owned land. (Doc. 26 at 9-10 (citing statutes and regulations requiring tribal consent for rights-of-way over tribal land)). In other words, Arizona-owned land once surrounded by private land which would allow public access instead became surrounded by Hopi Tribe-owned land for which public access was unclear and potentially barred, possibly reducing the Arizona-owned land's market value. (Doc. 26 at 4.)

After that purchase, the Hopi Tribe leased the Arizona-owned land from Arizona for grazing purposes. (Doc. 27 at 8.) In 2000, the tribe requested the United States condemn approximately 110,000 acres of Arizona-owned land. (Doc. 27 at 8.) In December 2024,

Arizona provided its concurrence and the United States condemned the land that same month. (Docs. 26 at 10, 30; 27 at 8.) Title of the property transferred to the United States on January 3, 2025, and the United States placed the land into trust for the Hopi Tribe. (Doc. 26 at 10.) The funds for the preliminarily-estimated value of the land were provided by the Hopi Tribe, deposited with the court, and distributed to Arizona; although the parties agreed the estimated just compensation would be $185/acre, the parties were permitted to contest the fair market value. (Docs. 5; 17; 26 at 10.)

Arizona now argues that because the condemned parcels lost value when the Hopi Tribe purchased adjacent private land in 1997 and 1998, the appraisal of the condemned land should "exclud[e the] deduction [in value] for the obstacles to obtaining access through the Hopi trust land."[1] (Doc. 34 at 13.) Accordingly, the parties dispute whether the appraisals valuing the required just compensation owed to Arizona should include the hypothetical condition that the parcels are surrounded not by Hopi Trust lands, but by private or government-owned lands. (Doc. 26 at 2, 4.)

## II.    Legal Posture

Arizona moves under FRCP Rule 71.1 for an order establishing appraisal instructions. (Doc. 26.) This court previously ordered that under Rule 71.1, it can decide all legal and factual issues, including the amount of just compensation due. (Doc. 19 at 6.) It set a simultaneous briefing schedule which permitted Rule 71.1 motions on legal issues to be filed while fact discovery is ongoing. (Doc. 19 at 7.) Motions raising mixed questions of law and fact are to be filed only after the close of fact discovery. (Doc. 19 at 7.)

## III.    Analysis

### A.  The Scope of the Project Rule

A condemnation action must award "just compensation" to the property owner whose property has been taken by the government. *United States v. 4.0 Acres of Land*, 175

---

[1] The parties devote substantial briefing to whether or not Arizona retained an implied easement over some of the private land before Hopi purchased it. But Arizona explicitly states it is "not asking the Court to resolve this issue" and only made the easement argument "to illustrate the diminution in value caused by the uncertainty relating to legal access to the Subject Property." (Doc. 34 at 13.) The court need not address this issue now.

F.3d 1133, 1139 (9th Cir. 1999). This calculation normally aligns with the property's "monetary market value" on the date of the taking, or what a willing buyer would pay in cash to a willing seller. *United States v. 320.0 Acres of Land, More or Less in Monroe Cnty., State of Fla.* ("*Monroe County*"), 605 F.2d 762, 781 (5th Cir. 1979); *see United States v. Miller*, 317 U.S. 369, 375-76 (1943). But in some cases, achieving fair compensation requires adding or removing certain elements from the property's market value—for instance, when the condemnation project itself causes the condemned land to lose value. *Monroe County*, 605 F.2d at 780-781. To ensure just compensation in these cases, courts determine whether the condemned land was within the scope of the government project at the time the government became committed to that project; if so, any loss in value due to that project cannot in fairness be passed on to the owner. *Miller*, 317 U.S. at 377 (establishing the scope of project, or "SOP," rule). If the SOP rule applies, the appraisal of the condemned land should exclude any depreciation attributable to the project. *Id.*; *see Monroe County*, 605 F.2d at 806 (SOP rule dictates any alteration in value "attributable to the project for which property is taken are to be disregarded in ascertaining fair market value and just compensation").

Courts apply the SOP rule where it was evident during the course of the project's planning the land would "probably" be needed for the project. The condemned land need not be "actually specified in the original plans for the project." *United States v. Reynolds*, 397 U.S. 14, 21 (1970). But if the condemned land is "merely adjacent" to land within the scope of the project or otherwise outside its scope, the SOP rule will not apply to compensate for the associated loss in value. *Miller*, 317 U.S. at 377. "There is no bright line rule for determining whether an action was probably within the scope of the project," but certain factors are frequently used, including: 1) the government's representations about the project's scope and finality, 2) the foreseeability of the condemnation, and 3) the amount of time that passed between the government's original commitment to the project and the action allegedly giving rise to liability. *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 982 (Fed. Cir. 2023) ("The Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits consider

some or all of these factors."). The United States and Hopi Tribe agree the court should analyze those three factors (*see* Doc. 27 at 10).[2] *United States v. Eastman*, 528 F.Supp. 1177, 1180 (D. Or. 1981) (citing *United States v. 62.17 Acres of Land, More or Less, in Jasper Cnty., Tex.* ("*Jasper County*"), 538 F.2d 670, 680 (5th Cir. 1976); *see also United States v. 49.01 Acres of Land, More or Less, Situate in Osage Cnty., State of Okl.* ("*Osage County*"), 669 F.2d 1364, 1367 (10th Cir. 1982) (formulating these factors slightly differently). The SOP rule is triggered as of the date when the "prospect of imminent condemnation becomes sufficiently definite that it would be a major factor in the decision of any reasonable person to buy or develop the property," which is generally when the government announces the project but may be later, depending on factual circumstances. *Monroe County*, 605 F.2d at 793 n.44, 807. Throughout the analysis, the project's scope "is not to be narrowly interpreted." *Id*. at 789.

Arizona argues the application of the SOP rule raises purely a legal question which this court can rule on now, before fact discovery is closed. (Doc. 34 at 14-15.) But although the Supreme Court has described whether the SOP rule applies as a "legal question" for the judge to answer as a preliminary matter before the jury decides just compensation, *Reynolds*, 397 U.S. at 20 n.14, facts do affect that initial legal determination. *Monroe County*, 605 F.2d at 793-98. Courts routinely remand to develop facts bearing on the legal question of whether the SOP rule applies. *See, e.g., id.* at 803; *Jasper County*, 538 F.2d at 681.

Here, as the United States and Hopi Tribe agree, undeveloped facts could affect the application of the SOP rule. (Docs. 27 at 17-20 (compiling cases where SOP issue was resolved only after evidence-gathering); 28 at 2-3.) The United States concedes (Doc. 27 at 17) the 1995 settlement's text clearly contemplates the state lands could be condemned because the project's primary purpose was to "facilitate the taking into trust of a *contiguous* parcel of land" which, because of the checkerboard, necessarily included this property

---

[2] Arizona contests whether these factors should be applied. (Doc. 34 at 9.) But even cases Arizona cites draw on these three factors, and this court will follow suit. *See Monroe County*, 605 F.2d at 791 (to apply SOP rule, it must be evident to public that property might be taken for project, which is determined by the three factors).)

(Doc. 28-1 at 39 (emphasis added)). *See* Pub. L. No. 104-301, 110 Stat. 3651 (1996). And the Hopi Tribe requested condemnation of the relevant land just four years after the settlement. (Doc. 26 at 10.) But the 24 years that passed between the Hopi Tribe's request and the condemnation may have caused the state lands to fall out of the scope of the project if it was no longer evident the condemnation would probably occur. *See Osage County*, 669 F.2d at 1367; *Monroe County*, 605 F.2d at 793, 797 ("18 years may indeed exceed [the temporal] limits [of the SOP rule]"). The parties agree there is currently little information on what happened during those years. (*See* Doc. 27 at 18.) Arizona may have represented it would forever refuse consent; the Hopi Tribe may have suggested it no longer pursued this land or wanted to spend its money elsewhere; or there may have been other actions (or inactions) by the parties that would have indicated to a reasonable landowner these parcels were no longer targeted for condemnation. *See Osage County*, 669 F.2d at 1367; *Jasper County*, 538 F.2d at 680-81. There appears to be correspondence between and representations by the parties from 2000 until 2023 which, once provided in discovery, may answer many of these questions. (Doc. 27 at 18.)

Because as-yet-undeveloped facts could affect the application of the SOP rule, the court cannot at this stage provide appraisal instructions to include or exclude the hypothetical condition Arizona requests. For these reasons, Arizona's motion is denied.

Accordingly,

**IT IS ORDERED** the State of Arizona's motion for appraisal instructions (Doc. 26) is **DENIED**.

Dated this 2nd day of April, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**